**J.P., by his Parents and Next Friends, M. Todd POPSON and Claudia Popson, Plaintiffs,**

v.

**WEST CLARK COMMUNITY SCHOOLS and Clark County Special Education Cooperative, Defendants.**

No. IP 01–1745–C M/S.

United States District Court, S.D. Indiana, Indiana Division.

Nov. 19, 2002.

Dorene J. Philpot, Indianapolis, IN, for Plaintiffs.

Andrew M. McNeil, Bose McKinney & Evans, Indianapolis, IN, for Defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, Chief Judge.

This matter comes before the Court on a motion by the Defendants, West Clark Community Schools and Clark County Special Education Cooperative (collectively "West Clark"), asking the Court to find that West Clark has met its responsibility to provide J.P. with a free and appropriate public education and that West Clark's proposed educational plan for the 2001–2002 year was reasonably calculated to continue to offer J.P. significant educational benefits. The Plaintiffs, J.P. and his parents, Todd Popson ("T. Popson") and Claudia Popson ("C. Popson") (collectively, the "Popsons"), argue that West Clark's educational program has been designed primarily to keep costs to a minimum and, as a result, has not given J.P. anything more than trivial educational benefits.

J.P. suffers from autism and speech apraxia. Autism is a generic term for a range of neurological disorders which affect different children differently. There is no cure, but autism can be manageable using behavioral and educational interventions. One treatment program that has shown promise for treating autistic children is the Applied Behavior Analysis ("ABA") method used by O. Ivar Lovaas, Ph.D., at the University of California Los Angeles. This program focuses primarily on the use of discrete trial training ("DTT"), a series of short, discrete, one-on-one lessons, with clear beginnings and endings, repeated over and over, with positive reinforcement for correct answers.

The Popsons believe that the ABA/DTT program is so far superior to other programs that it should be recognized by the Court as the only reasonable way to teach autistic children like J.P. West Clark disagrees, preferring to use a variety of techniques which it argues have proven to be successful in treating autistic children. While West Clark's program includes some ABA/DTT training, it also includes a structured classroom, which West Clark urges provides a more meaningful context for the development of functional communication, a greater opportunity for the development of social skills, and an easier transition towards the ultimate goal of placing J.P. in an ordinary classroom.

Given their philosophical differences, West Clark and the Popsons disagree about a number of specific issues regarding the adequacy of the educational services provided by West Clark. In addition, the Popsons feel that their views were not taken seriously. In the Popsons' opinion, West Clark has simply attempted to impose an individualized educational plan ("IEP") upon J.P. without taking into account the Popsons' input, as required by law.

However, the Court finds that the Popsons have failed to prove their underlying claim that the ABA/DTT approach they favor is the only reasonable method for teaching J.P. West Clark has provided the testimony of J.P.'s teachers and of outside educational experts in support of its program. The Court further finds that the fact that the parties had a principled disagreement does not mean that West Clark failed to take the Popsons' views seriously. To the contrary, J.P.'s teachers and school administrators demonstrated a willingness to incorporate ABA/DTT methods into their teaching plans for J.P. In addition, West Clark officials showed flexibility in terms of adding more hours to J.P.'s program (including more one-on-one hours), and in terms of adding more communication goals of the type favored by J.P.'s parents.

The Court is not qualified to arbitrate a dispute about educational methodologies. It is enough that West Clark's approach has been reasonably calculated to confer meaningful educational benefits upon J.P. Therefore, the Court **GRANTS** West Clark's motion for summary judgment.

## I. THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

■ Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to guide and assist states in educating disabled children. In order to receive funding under the IDEA, a state must provide each disabled student with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(1). This education must be tailored to the unique needs of the disabled student through an individualized education plan ("IEP"). 20 U.S.C. § 1414(d). The Seventh Circuit has characterized a "free appropriate public education" as one which guarantees a reasonable probability of educational benefits with sufficient support-

ive services provided at public expense. *Board of Educ. of Community Consol. School Dist. No. 21, Cook County, Ill. v. Illinois State Bd. of Educ.*, 938 F.2d 712, 717 (7th Cir.1991), *cert denied*, 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992).

■ In *Board of Educ. of Hendrick Hudson Central School District v. Rowley*, the Supreme Court emphasized that there are two aspects to the IDEA's requirement that a school (or local educational agency) provide each disabled child with a FAPE. 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). First, the school must provide all of the procedural safeguards laid out in the IDEA. *Id.* at 206, 102 S.Ct. 3034. Second, the IEP that is ultimately formulated for the child must be *appropriate, i.e.* "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207, 102 S.Ct. 3034.

## A. THE PROCEDURAL SAFEGUARDS

In crafting the IDEA, Congress placed great importance upon procedural safeguards, apparently believing that those safeguards would go a long way towards ensuring that a reasonable IEP would be formulated for each child covered by the act. *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. An IEP is "a written statement" that must include:

(1) "the child's present levels of educational performance;"

(2) a list of "measurable annual goals" that will "enable the child to be involved in and progress in the general curriculum," which list should also include "benchmarks or short-term objectives" designed to meet the child's specific disability needs;

(3) a determination of "the special education and related services" necessary to enable the child "to advance appropri-

ately toward attaining the annual goals [and] to be involved and progress in the general curriculum;"

(4) a method for measuring "the child's progress toward the annual goals;" and

(5) a plan for keeping "the child's parents ... informed (by such means as periodic report cards)" about the child's progress, "at least as often as parents are informed of their nondisabled children's progress."

20 U.S.C. § 1414(d)(1)(A).

The IEP must be prepared by a "team" composed of:

(1) the parents of the disabled child;

(2) at least one of the child's regular education teachers;

(3) at least one of the child's special education teachers;

(4) a representative of the local educational agency "who is qualified to provide, or supervise ... specially designed instruction [for] children with disabilities, [and who] is knowledgeable about the general curriculum, and ... about the availability of resources of the local educational agency;"

(5) an individual "who can interpret the instructional implications of evaluation results;" and

(6) other individuals, at the request of the parent or the agency, "who have knowledge or special expertise regarding the child."

20 U.S.C. § 1414(d)(1)(B). In formulating an individualized education plan, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial evaluation or most recent evaluation of the child, and other special factors such as strategies for positive behavioral intervention, communication needs, and the need for supplementary aids and services. 20 U.S.C. § 1414(d)(3).

The "local educational agency" also must "ensure that the IEP Team reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved." 20 U.S.C. § 1414(d)(4)(A). When necessary, the IEP must be revised to address "any lack of expected progress toward the annual goals, ... [any] information about the child provided to, or by, the parents," or any other "anticipated needs" of the child. *Id.*

The educational agency must provide prior written notice to the parents before deciding to initiate a change or deciding to refuse a change in a disabled child's evaluation or educational placement. 20 U.S.C. § 1415(b)(3). The notice must include a description of the action proposed or refused by the agency and a thorough and specific explanation of why the agency proposes or refuses to take the action. 20 U.S.C. § 1415(c).

The parents must be given an opportunity to examine all records relating to their child and to participate in any meetings regarding the evaluation and educational placement of their child. 20 U.S.C. § 1415(b)(1). The parents are also entitled to obtain an independent educational evaluation of their child. *Id.*

If the parents are not satisfied in any matter relating to the provision of a FAPE, they must be given an opportunity to present their complaints. 20 U.S.C. § 1415(b)(6). They may also seek mediation in the event that their concerns are not satisfactorily answered. 20 U.S.C. § 1415(b)(5). Or, they may request a due process hearing in an administrative court. 20 U.S.C. § 1415(d). If the parents are not satisfied with the outcome of the due process hearing, they may institute a civil action appealing the hearing officer's decision. 20 U.S.C. § 1415(i)(2).

## B. SUBSTANTIVE REQUIREMENTS

Each handicapped child covered under the IDEA is entitled to a free and appropriate public education. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A); 34 C.F.R. § 300.1. The vehicle for determining what constitutes a FAPE is the child's individualized education plan. 20 U.S.C. § 1401(11).

■ The requirement, articulated in *Rowley*, that the IEP be reasonably calculated to confer educational benefit is not a *de minimus* standard. *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3rd Cir.1988). The IEP must call for "significant learning" and confer "meaningful benefit" upon the child for whom it is designed. *Id.*

■ But the IEP need not be designed to enable the child to achieve his or her highest potential. "[T]he purpose of the IDEA is to *open the door of public education* to handicapped children." (Emphasis added.) *Board of Educ. of Murphysboro v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1167 (7th Cir.1994). It is not to guarantee any particular level of education or outcome. *Rowley*, 458 U.S. at 208, 102 S.Ct. 3034.

■ Thus, the measure of appropriateness for an IEP does not lie in the outcomes achieved. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir.1999). While outcomes may shed some light on appropriateness, the proper question is whether the IEP was objectively reasonable at the time it was drafted. *Id.*

■ The IDEA unequivocally grants parents the right to participate in making educational decisions regarding their handicapped children. *Weiss v. School Bd. of Hillsborough County*, 141 F.3d 990, 998 (11th Cir.1998). But parents do not thereby obtain the right to compel a school district to provide a specific educational program or use a specific methodology.

*Id.*; *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.1988), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327. A state-proposed IEP which meets the substantive requirements of the IDEA cannot be invalidated merely because the parents believe that a better educational program exists for their child. *Board of Educ. of Community Consol. School Dist. No. 21, Cook County, Ill.*, 938 F.2d 712, 717 (7th Cir.1991) (clarifying the holding in *Lachman*). On the other hand, parents may seek reimbursement for the costs associated with unilaterally placing their child in an alternative educational program, provided that they can show, first, that their child's IEP was not appropriate (under *Rowley's* two-pronged standard) and, second, that their own choice of an alternative placement satisfied the FAPE criteria. *School Committee of Town of Burlington Mass. v. Mass. Department of Education*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

■ In addition to requiring that a child's IEP be designed to confer meaningful educational benefits, IDEA further mandates that the child be provided these benefits in the "least restrictive environment" possible. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. §§ 300.550 to 300.556. This reflects a presumption on the part of Congress that the education of disabled children generally is best achieved by "mainstreaming," *i.e.*, including disabled children in activities with normal children as much as possible. *Oberti v. Board of Education of the Borough of Clementon School District*, 995 F.2d 1204, 1214 (3d Cir.1993). The IDEA provides that: "To the maximum extent appropriate, children with disabilities [should be] educated with children who are not disabled, and ... removal of children with disabilities from the regular educational environment [should] occur[ ] only when

the nature or severity of the disability ... is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B).

## II. FACTS AND PROCEDURAL POSTURE

The Popsons are appealing a decision in administrative court by an independent hearing officer ("Hearing Officer" or "HO") that J.P. is not entitled to the special services that the Popsons have requested for him. The parties have not provided any supplemental evidence for the Court's consideration. Therefore, this appeal must be based entirely upon the facts that were considered in the administrative hearings, together with the findings of the Hearing Officer.

In the Defendants' Statement of Facts ("D. Facts"), West Clark has called the Court's attention to 145 facts from the record. The Popsons, in their Statement of Facts ("P. Facts"), have listed 54 additional facts for the Court's consideration. West Clark, in turn, has responded with 52 more facts in its Additional Statement of Facts From the Administrative Record ("D. Reply Facts").

The Popsons' first "fact" is merely an admission that the preponderance of West Clark's facts are accurate. The Popsons' second fact then lists those facts that they consider to be inaccurately stated or otherwise objectionable. The Popsons state, without explanation, that they do not concur with West Clark's facts 4, 21, 23, 27–29, 32, 35–6, 38, 40, 52–3, 57, 65, 72–4, 80–2, 86, 88–9, 90, 92, 94, 99, 103, 104–5, 108, 109, 114, 117.

The Court finds that this method of objecting to the specified facts does not comply with Local Rule 56.1 because (a) the Popsons have not specified what part or aspect of each of West Clark's alleged facts they find objectionable, (b) the Pop-

sons have not specified the reason(s) for their various disagreements with or objections to the listed facts, and (c) the Popsons have not provided citations to the record to support an alternative interpretation of the facts. This failure to comply is not merely a technicality. In order to determine if there is truly a material fact at issue between the parties, the Court must know *why* the Popsons disagree. The Court cannot be expected simply to take it on faith that all the facts the Popsons object to are so inaccurate as to be unworthy of the Court's consideration.

On the other hand, the Court and the parties have an interest in seeing that substantial justice is served regarding the education of J.P. Therefore, to the extent that one or more of the 54 facts listed by the Popsons explicitly raises an issue of material fact between the parties and is properly supported with citations to the record, the Court will consider it. Otherwise, the Court will deem that all facts listed by West Clark have been admitted by the Popsons.

With that in mind, and giving "due weight" to the Hearing Officer's findings, the relevant facts are these:

J.P. was born on January 24, 1997, and diagnosed with autism in March of 1999 by the Child Evaluation Center in Louisville, Kentucky. Administrative Record ("AR") at 24, 2530 (HO Finding # 5). J.P. was subsequently diagnosed as having speech apraxia, a neurologically based disorder that impairs his ability to make the oral motor movements necessary for speech. AR at 2531 (HO Finding # 7).

J.P.'s disabilities entitled him to receive special education services under Indiana's Article 7. AR at 173, 2532 (HO Finding # 10). He was enrolled in the county's First Steps program, and an Individualized Family Services Plan (IFSP) was designed for him. C. Popson Tr. at 60; AR at 2530

(HO Finding # 6) and 2725, ¶ 7. This plan included physical therapy, developmental therapy, speech therapy, and occupational therapy. *Id.* J.P. continued in the First Steps program until, at the age of three, he was enrolled in West Clark's public preschool program. *Id.*

As part of the enrollment process, West Clark conducted an evaluation of J.P.'s cognitive ability, adaptive skills, social and emotional functioning, behavior, readiness skills, and speech and language skills. AR at 46, 151–66, and 2531 (HO Finding # 8). West Clark also evaluated his physical therapy and occupational therapy needs. *Id.*

West Clark found that J.P.: (1) was not yet toilet trained; (2) did not engage in appropriate play or use common gestures; (3) was significantly below average in intellectual and cognitive functions; (4) was mildly deficient in adaptive functioning; (5) was not able to imitate adult sounds, use gestures to make his needs known, or raise his arms in response to commands such as "up" or "come here," (6) was not able to use any words, though he did know the meaning of a few words; and (7) was not able to listen to or follow instructions requiring an action and an object. AR at 152, 155–6. Based upon the Childhood Autism Rating Scale, West Clark determined that J.P. was severely autistic because he: (a) displayed "a marked impairment in the use of multiple nonverbal behaviors;" (b) had not yet developed peer relationships appropriate to his developmental level; (c) lacked verbal communication; (d) did not engage in spontaneous imaginative play; and (e) exhibited stereotyped repetitive motor mechanisms. AR at 157.

The Defendants rated the Plaintiff's expressive communication skills as being at the level of a four-to eight-month-old, while rating his receptive communication skills at the level of eight to sixteen months. AR at 160 and 2532 (HO Finding # 8). The Plaintiff exhibited fine and gross motor delays, and he did not use any vocalizations to accompany his non-verbal gestures or body movement. *Id.* (HO Finding # 9).

As a result of the evaluation, West Clark recommended that J.P. would benefit from continued participation in an early childhood environment that provides him with frequent opportunities to interact with peers, as well as with adults, and to use a wide variety of manipulative materials. AR at 163. According to West Clark's report, J.P.'s educational program should provide consistent routines, with ample preparation for any changes in routine, an opportunity for structured social interchanges, an opportunity to learn a functional communication system, and consistent reinforcement of desired behaviors. *Id.* The report also stated that the Plaintiff needed to be encouraged to attend to individuals and tasks by making good eye contact and that he would require speech therapy to address his functional communication difficulties. *Id.* In addition, the use of the so-called picture exchange communication system ("PECS") was recommended. *Id.*

Shortly after the evaluation, in January of 2000, a case conference was convened to develop an IEP for J.P. The Case Conference Committee included special education supervisor, Sharon Reich ("Reich"), together with West Clark's speech language pathologist, occupational therapist, physical therapist, school psychologist, and educational diagnostician. AR at 169; Reich Tr. at 977. J.P.'s parents also participated in the conference. AR at 170–2.

The Popsons identified their primary concerns as being, in order of importance, first the development of J.P.'s sensory skills, then his communication skills, and then his social skills. AR at 170. The

conference notes reflect an overall consensus that J.P.'s nonverbal skills were his strength, but that his imitation skills were very limited. AR at 171. It was thought that the PECS would be an effective tool for him. *Id.*

The Case Conference Committee set the following annual goals for J.P.: (a) develop play skills to a level appropriate for his age; (b) attend to developmentally appropriate tasks for up to ten minutes; (c) improve imitation skills to the point where they are automatic; (d) improve communication skills by six months, as measured by age level; (e) improve self-help skills by six months; (f) improve fine motor skills by six months; and (g) improve sensory motor skills to a functional level. AR at 173, 2532 (HO Finding # 10). In addition, various short-term objectives were delineated. AR at 175–81, 2532 (HO Finding # 10). Success in achieving these short-term objectives was to be measured by direct teacher observation, class participation, and the use of charting and logs. *Id.*

The committee members determined that a full time (50–100%) program at West Clark would be appropriate for J.P. AR at 185. The committee explicitly rejected other options, such as home-based education, education through a separate private facility, and education through a public residential facility. *Id.*

J.P.'s initial IEP called for him to be placed in a preschool program with special education assistance for 12.5 hours per week. AR at 185–6, 2532 (HO Finding # 10). This included 80 minutes per week of speech therapy and 120 minutes per week of occupational therapy. *Id.* The IEP further required that a teacher's aide be available to assist J.P. *Id.*

J.P. began attending public preschool classes on January 24, 2000. C. Popson Tr. at 62. An annual case review was conducted on April 19, 2000. AR at 192. The Case Conference Committee included Reich, J.P.'s speech therapist Theresa Wahl ("Wahl"), J.P.'s special education teacher Mary Beth Cochran ("Cochran"), J.P.'s occupational therapist Mary Beth Cisco ("Cisco"), West Clark's principal, and the Popsons. AR at 193.

The Case Conference Committee reviewed J.P.'s progress under the initial IEP and noted that J.P. had adapted well to the preschool classroom activities. AR at 198. In a series of detailed evaluations of specific skills, the various members of the committee found that J.P. had "made progress" in more objectives than not. AR at 192–228, 2532 (HO Finding # 10). According to the committee, J.P. had made progress in communication skills, AR at 203–4, play skills, AR at 205–7, attending to developmentally appropriate tasks, AR at 208–10, improving imitation skills, AR at 211–13, improving self-help skills, AR at 214–16, and improving fine motor skills, AR at 218–20. More specifically, the committee noted that J.P. had made progress in toileting, the removal and hanging of his coat and hat, greeting adults, playing and interacting with adults, opening a container and removing items, imitating lines and circular strokes, and imitating block patterns using pattern cards. AR at 196–7, 202.

J.P.'s weakest point seemed to be his functional communication skills, encompassing expressive and receptive communication. The committee noted that J.P. was making progress in vocalizations, but little or no progress in making verbalizations and approximating words. AR at 2532 (HO Finding # 10).

The committee established goals for a new IEP for the period from April 2000 to April 2001 as follows: (a) improve self-help skills by another six months; (b) improve play skills up to age level; (c) improve imitation skills to an automatic level; (d)

attend to a developmentally appropriate task for up to ten minutes; (e) improve fine motor skills by another twelve months; (f) improve functional communication skills by nine months; and (g) use functional sensory processing skills to participate in classroom activities. AR at 200. The committee again determined that a full time program at West Clark was appropriate to meet J.P.'s needs. AR at 225.

The committee further determined that J.P. should receive extended school year ("ESY") services focusing upon his communication skills in order to avoid substantial regression of those skills during the summer. AR at 229 and 2533 (HO Finding # 11). The ESY services were to consist of a total of eight one-hour speech therapy sessions conducted once per week over an eight-week period. *Id.* J.P.'s parents expressed concern that the ESY would not be sufficient to prevent regression, but they consented to the new IEP anyway. AR at 228–9.

West Clark's expert witness, Claire Thorsen ("Thorsen"), a speech and language pathologist, testified that the eight hours of speech therapy during the summer of 2000 was probably sufficient. Thorsen Tr. at 1042, 1096–7. "We seldom see with students who have autism a regression once they've learned particular kinds of skills. It may fade out but come back in." *Id.* at 1097. J.P.'s speech therapist Wahl testified that, in fact, J.P. did not show significant signs of regression when he returned to school in the fall of 2000. Wahl Tr. at 755–7; AR at 262. "[J.P.] made gains in a very short period of time after school started." A.R. at 2533 (HO Finding # 11). She also testified that, in her opinion, the eight hours of speech therapy offered to J.P. in the summer of 2000, as well as the twelve hours subsequently offered to J.P. in the summer of 2001 were appropriate to prevent regression. A.R. at 2543 (HO Finding # 43).

With this evidence in mind, the Hearing Officer concluded that the "[t]estimony indicated that the [C]ase [C]onference [C]ommittee had determined that eight hours of speech therapy was appropriate to prevent regression or minimize it to the extent that skills could be recouped when school started in the fall." A.R. at 2533 (HO Finding # 11).

On the other hand, the Popsons felt that there was some regression. A.R. at 262. And, to the extent that that regression had been minimized, it was because of their efforts in obtaining extra therapy. C. Popson Tr. at 43–44, 93–5; A.R. at 262 and 2726, ¶ 9.

At the hearing, the Popsons provided three expert witnesses, all committed to the ABA/DTT methodology, who averred that eight hours of speech therapy for an entire summer was generally inadequate to maintain an autistic child's skills. AR at 209, 584, 668. Testimony was also presented that, given J.P.'s problem with speech apraxia (which is not common in autistic children), even more hours of speech therapy probably ought to have been required. AR at 226. With the exception noted below, these observations were offered after-the-fact and not based upon direct observation of J.P.'s particular needs. As a result, the experts avoided being pinned down about how many hours they thought J.P. should have had.

The director and founder of an educational group hired by the Popsons to provide a supplemental ABA/DTT program for J.P. did specifically state that 30–40 hours of speech therapy during the course of the summer would be more appropriate for J.P. AR at 634. Also, one of West Clark's own expert witnesses testified that eight hours might not be enough, unless it also involved working with the family so that they could follow up with

J.P. on a more regular basis. AR at 948–9.

The Popsons allege that the reason J.P.'s IEP only included eight hours for speech therapy in the summer of 2000 was that West Clark officials felt constrained by administrative and financial concerns. The Popsons first cite evidence that two other autistic children in the school system also received eight hours of speech therapy during the summer of 2000, even though they were both verbal and neither of them suffered from apraxia. AR at 560–1, 573. The Popsons then cite evidence that no child received more than eight hours of speech therapy. AR at 2000. Finally, the Popsons cite evidence from parents (including the Popsons themselves) that West Clark's special education director, Reich, had made several comments, either about staffing problems or about not having unlimited resources, that were suggestive of financial constraints. The most relevant of these comments was described in the testimony of C. Popson. AR at 90. She testified that when she asked Reich why J.P. could not be given more than eight hours of speech therapy during the summer of 2000, Reich told her that there was a staffing shortage. According to Popson, Reich also told her: "we have jobs posted for speech therapists right now as we speak."[1]

Reich denied the Popsons' allegations, testifying that the amount of ESY services offered in the IEP was not based upon administrative concerns, such as available funds or staffing. AR at 2544 (HO Finding # 45). She testified that, although she could no longer remember the particular rationale by which eight hours was deemed appropriate for J.P. at the April 2000 case conference, the factors that they considered are the severity and degree of regression that are likely to occur during the summer. *Id.* She further pointed out that she is well-versed on the question, having

---

**1.** As far as the Court can tell, the only other references to financial and administrative problems cited by the Popsons do not really show what the Popsons claim. One parent testified that when she first met Reich, Reich said that the Clark County Schools program cannot do everything that the First Steps program did. AR at 573–4. But the essence of their dispute seemed to be that the school system would not provide transportation to and from the summer speech therapy sessions. *Id.* According to the parent, Reich told her that Clark County "only go[es] strictly on education and [does not] do anything extra." *Id.* Another parent testified that her child's speech therapist had moved out of town just before the summer, and the school had staffing problems trying to replace the therapist. AR at 570. According to that parent, the only consequence of this staffing problem was that "[w]e only received the eight hours that they offered us." *Id.* That suggests that West Clark met its obligations in the IEP, not that it failed to meet them. Yet another parent testified that her child's classroom only had one aide when her child first entered the class because the school was still searching for another aide. AR at 500–3. The parent admitted, however, that it only took about a month before another aide was brought into the classroom. *Id.* The remaining references come from T. Popsons' testimony, based upon his continuing struggle to persuade West Clark to provide J.P. with more hours of individual instruction. At one point, T. Popson was pressuring Reich because he did not feel that his son's IEP included enough one-on-one instruction time. AR at 533–4. After Reich said that the school was going to provide four hours of one-on-one instruction on Fridays, T. Popson said it would not be enough. *Id.* After she said that Cochran would provide an additional one hour per day taken from her lunchtime, T. Popson still said it would not be enough. *Id.* Then, according to T. Popson, Reich said to him: "Mr. Popson, we don't have unlimited resources." *Id.* In addition, T. Popson testified that after the April 2000 Case Conference Committee generated its proposed IEP, which included only eight hours of speech therapy for the summer of 2000, Popson objected that eight hours would not be enough and Reich said: "This is it. This is what we have to offer."

gone to many conferences and workshops on autism. *Id.*

On August 18, 2000, the Case Conference Committee reconvened to discuss potential revisions to J.P's 2000–2001 IEP. AR at 234. At that time, the Popsons asked West Clark for any charts and logs indicating J.P.'s progress. Both Wahl and Cochran indicated that they did not keep charts and logs of the type the Popsons were seeking.[2] Wahl Tr. at 773–5; Cochran Tr. at 324–5, 414. Instead, Wahl said that she logs and documents percentages of progress. Wahl Tr. at 776; *see, e.g.,* 313–421AAA (logs made by Wahl subsequent to this meeting, documenting J.P.'s progress). And Cochran said that she keeps a school-home notebook with progress reports to give to the parents on a daily basis.

The Hearing Officer found that the documents provided to the parents by Wahl and Cochran contained "written narrative comments about [J.P.'s] performance, behavior, and progress." AR at 2534 (HO Finding # 15). But, they were lacking in providing a clear picture of the amount of progress J.P. was making toward specific goals and objectives. *Id.* "Other than the IEP forms that provide a method for recording progress, no charts of progress on a regular basis were provided." *Id.*

T. Popson expressed his belief that J.P. had not made any progress since he started at preschool the previous January. AR at 234 and 2534 (HO Finding # 16). He stated that J.P. was not developing the appropriate play skills with toys. *Id.* He further stated that the ESY services J.P. received were of little benefit to him and that his sensory skills had regressed over the summer. *Id.* C. Popson expressed her concern that, although J.P. may have made

progress "here and there," he had not met any of his IEP objectives. *Id.*

The Popsons stated their opinion that J.P. needed a minimum of 25 hours per week of direct instruction in order to make satisfactory progress. *Id.* They wished to have more direct (one-on-one) instruction with a blend of preschool programming. *Id.*

West Clark agreed that more direct instruction would be appropriate. *Id.* at 236 and 2534–5 (HO Finding # 17). The committee decided to increase J.P.'s instruction from 12.5 hours per week to 20 hours per week. *Id.* Sixteen of the hours were to be provided in the preschool setting with some "pull out" time as needed to increase attention and decrease distractions. *Id.* Four hours were to be provided in a one-on-one special education setting on Fridays. *Id.* In addition, Cochran agreed to use her lunch hour to provide J.P. with one hour of individual instruction per day. Cochran Tr. at 339; AR at 2534–5 (HO Finding # 17). The IEP also provided that the speech therapist would continue to work with J.P. for 90 minutes each week. *Id.* The Popsons consented to this revised 2000–2001 IEP in August of 2000.

West Clark implemented the revised IEP using what it acknowledged to be an "eclectic" approach that incorporated PECS, one-on-one instruction, and some ABA/DTT techniques, together with an attempt to include J.P. with the other kids in the preschool program. Cochran Tr. at 384–6; A.R. at 2542 (HO Finding # 37–8). Wahl testified that she used several different approaches with J.P. to get him to vocalize or verbalize. Wahl Tr. at 714. She further testified that she had been trained in the discrete trial training methods advocated by the proponents of Ap-

---

2. The Popsons were apparently seeking the type of logs and charts maintained by proponents of the "ABA/DTT" theory for teaching autistic children. The dispute about that theory will be discussed below.

plied Behavioral Analysis and that she uses those methods in practically everything she does. *Id.* at 704–5.

Cochran testified that J.P. seemed to benefit from West Clark's implementation of the revised 2000–2001 IEP. Cochran Tr. at 412. In particular, J.P. benefitted from all the one-on-one time in the fall of 2000, learning to shape his mouth, imitate, and start vocalizing. *Id.* at 398. Wahl testified that she saw significant gains in J.P.'s functional communication. Wahl Tr. at 787–8. "I think he's probably got one of the best programs in Southern Indiana." *Id.* at 790.

At some point during the fall of 2000, the Popsons engaged a private organization, Behavioral Intervention for Autistic Children ("BIFAC"), to provide J.P. with an at-home ABA/DTT program to supplement J.P.'s preschool program. C. Popson Tr. at 66. On December 1, 2000, the Popsons sponsored an ABA/DTT therapy workshop put on by BIFAC. *Id.* at 67. Cochran, Wahl, and Cisco, along with two instructional aides, attended the workshop. *Id.* at 43, 77; Montgomery Tr. at 617.

Following the workshop, J.P.'s parents had planned to start J.P. at once on an at-home ABA/DTT program consisting of 22 hours per week of therapy in addition to the public preschool program. C. Popson Tr. at 68. However, due to illness, J.P. did not commence the BIFAC program on a consistent daily basis until shortly before February 1, 2001. T. Popson Tr. at 106; AR at 262.

West Clark's staff attempted to cooperate with BIFAC. A list of the objectives developed by BIFAC was posted in J.P.'s classroom. Cochran Tr. at 333. Wahl testified that she attempted to work collaboratively with BIFAC to help J.P. develop

spoken language. Wahl Tr. at 713. And, by the Popsons' own admission, Cochran incorporated the at-home ABA/DTT program into her one-on-one time with J.P. C. Popson Tr. at 78.

In February of 2001, the Popsons requested a new case conference, which was convened on February 13. AR at 257, 259. The Case Conference Committee included the Popsons, Cochran, Wahl, Reich, Cisco, J.P.'s general education teacher Connie Runyon ("Runyon"), and lawyers for both West Clark and the Popsons. AR at 193.

School personnel indicated that they believed J.P. had made substantial progress towards some of his objectives, but little or no progress towards others. AR at 2535 (HO Finding # 20). West Clark noted progress in playing with and manipulating a variety of toys, taking turns while playing with peers, sharing toys with peers, and initiating interactions with peers and adults. AR at 265–6 and 2535 (HO Finding # 20). West Clark also noted that J.P. could undo simple fasteners, such as zippers and snaps, execute the toileting sequence,[3] hang his coat and backpack on a hook, imitate motor actions with objects, imitate body movements, turn and look when his name was called, attend to a task until it is completed, visually attend to a speaker for up to one minute, maintain eye contact with a variety of toys for two to four minutes, imitate oral facial movements, respond to simple commands, greet adults and peers, request cessation of an activity using a picture or sign, request desired objects or actions using picture communication with gradually fading cues, and identify a familiar picture or object from classroom themes when that object was named. AR at 267–75. West Clark also pointed out that J.P. had begun mak-

---

**3.** As the Court understands it, this refers only to the mechanical processes of using the bathroom. Other evidence suggests that J.P. did

not know how to control or communicate *when* he needed to go to the bathroom. Nor did he communicate when he was "wet."

ing progress with imitating verbalizations. AR at 2535–6 (HO Finding # 20).

However, the Popsons noted that only four of the approximately 35 objectives listed in the 2000–2001 IEP had actually been deemed "met" by West Clark. AR at 508. T. Popson further believed that, while some of the goals in the 2001–2002 IEP were similar to the previous ones, others of the unachieved goals in the 2000–2001 IEP, such as toileting, had inexplicably been dropped. AR at 508–10.

The Popsons again asked to see charts and logs documenting J.P.'s progress. AR at 259 and 2535 (HO Finding # 18). West Clark offered to make the teachers' daily notes available to them, but the Popsons did not think that was sufficient. *Id.* They wanted *objective* data to see if J.P. was really making progress. *Id.* The Popsons further expressed their belief that West Clark should emphasize verbalizations and vocalizations, including working on consonant blends. *Id.* But Wahl expressed her opinion that J.P. was not yet ready to work on consonant blends. *Id.*

The Popsons criticized some of the goals and objectives established by the committee as being spurious because J.P. had already achieved them, for example, imitating body movements, imitating songs, snipping with scissors, and tracing lines with a pencil. AR at 2535 (HO Finding # 19). In addition, the Popsons proposed that the committee recognize the ABA approach as the only appropriate means for teaching J.P. AR at 2536 (HO Finding # 21). Although J.P. had been working with BIFAC for only about two weeks, the Popsons believed that J.P. enjoyed the program and was making good progress. *Id.*

Therefore, the Popsons wanted West Clark to fund at least 40 hours per week of combined home and school training, under the supervision of BIFAC personnel, with an emphasis upon verbal behavior.[4] AR at 261, 264. More specifically, the Popsons requested: (1) monthly training for J.P's teacher, aides, and therapists via BIFAC; (2) monthly training for themselves as parents, via BIFAC; (3) the use of an aide at school either trained in ABA or provided by BIFAC; (4) the addition of a BIFAC member to J.P's IEP team; (5) an ESY that is consistent with and commensurate with J.P.'s school year training, so that there will be no regression; (6) a more extensive data collection system to be analyzed by trained ABA personnel; and (7) reimbursement for costs associated with the BIFAC program. AR at 262, 264.

In response, West Clark agreed to revise its proposed IEP for the 2001–2002 school year to include an objective for imitating phrases. AR at 261, 2535 (HO Finding # 18). In addition, West Clark agreed to increase the number of hours of ESY speech therapy from the eight that were allocated in the summer of 2000 to twelve hours for the summer of 2001. AR at 1010–13 and 2545 (HO Finding # 49). This was to be provided in addition to regular summer schooling, consisting of twelve hours per week for six weeks, which had not been provided in summer 2000. AR at 2545 (HO Finding # 49). However, West Clark expressed its view that some of the Popsons' specific language goals for J.P. were already included

---

**4.** This seems to be a point of controversy between the parties. J.P.'s preschool teachers felt that they had made good use of the PECS system in the classroom. AR at 2541 (HO finding # 35). PECS is a method of communication for children who have little expressive language or vocabulary. *Id.* The child gives pictures of desired objects or activities to an adult as a means of communicating non-verbally. *Id.* Apparently, the Popsons believe that this impedes the development of verbalization, while West Clark believes that it benefits J.P. and encourages communication.

in West Clark's functional communication goals, while other language goals were not realistic for J.P. AR at 260.

The Hearing Officer noted that the proposed IEP contained annual goals in the areas of fine motor skills, sensory processing, imitation, play skills, attending to tasks, and improving functional communication that were appropriate for J.P. AR at 2545 (HO Finding # 48). The Hearing Officer further found that, under each goal, there were specific objectives listed "that are behaviorally stated and are measurable." *Id.* After noting that there was no goal or objective for toileting, the Hearing Officer found that: "[t]he document contains statements of present levels of educational performance, general strategies and modifications, and specific strategies for improving functional communication. It provides for 90 minutes per week of speech therapy, 20 hours per week of classroom instruction, and 180 minutes per month of occupational therapy." *Id.* The Hearing Officer further stated that, although the document recognizes J.P.'s needs for direct instruction to achieve some goals and objectives, it does not specify the amount of one-on-one instruction to be provided. *Id.* As for the proposed ESY for the summer of 2001, the Hearing Officer noted, with apparent approval, that the IEP called for 12 hours per week of classroom instruction and 30 minutes per week of occupational therapy, in addition to the 12 hours during the course of the summer for speech therapy. AR at 2545 (HO Finding # 49).

In proposing its IEP, the Case Conference Committee rejected the Popsons' request for a 40–hour–per–week program, concluding that 20 hours would suffice, based upon J.P.'s past progress. AR at 261–2. Similarly, West Clark rejected the

Popsons' request for an IEP based exclusively upon ABA/DTT methods, finding that J.P. had made significant progress during the school year under West Clark's more eclectic approach. *Id.*

Applied Behavioral Analysis ("ABA") is a broad field of research and practice in which the principles of learning theory are applied not only in education, but also in other areas such as sports. AR at 2537 (HO finding # 23). Discrete trial training (DTT) is a method of instruction in which tasks are broken down into small sub-tasks, instruction is given on each individual sub-task, and positive reinforcement is given for correct answers. *Id.* DTT entails frequent repetition of drills set up in a programmed sequence. *Id.* The results can be measured with objective data, noting the number of trial successes. *Id.*

As applied to children with autism, the ABA/DTT approach consists of a curriculum of specific tasks that emphasize verbal behavior and language development. *Id.* The seminal scientific study with regard to the use of ABA/DTT for children with autism was published in 1987.[5] AR at 2536 (HO finding # 22). Since that time, the study has been criticized for its methodological limitations, including the inability to assign children with autism to control and experimental groups. *Id.* Proponents argue that, while the original study cannot be replicated exactly, subsequent research has also shown that the use of the ABA/DTT system results in improvement in verbal and academic skills for autistic children. *Id.* However, other researchers question whether the method has been sufficiently validated to warrant broad implementation as a standard treatment for autism. *Id.* In addition, some are concerned that the reported favorable out-

---

5. The principle investigator was Dr. O. Ivar Lovaas, and the approach utilized is often referred to as the Lovaas method.

comes will not generalize to other environments, such as the public school classroom. *Id.*

The Popsons' expert witnesses recommended that anywhere from 25 to 40 hours per week of instruction using the ABA/DTT methodology be provided for students with autism like J.P. AR at 2538–40, 43 (HO findings ## 26–7, 29, 32, 43). But, again, the witnesses did not base their testimony on their knowledge of J.P.'s specific needs or rate of progress.

The Popsons also presented expert evidence that about 75% of the ABA/DTT program should be based at home, where there are fewer distractions, leaving about 25% to be implemented at the preschool. AR at 2538 (HO finding # 26). On that basis, the Popsons argued that J.P. should be receiving from 30–40 hours per week of home-based ABA/DTT instruction, together with about 10 to 15 hours per week of his current preschool program to facilitate socialization. *Id.*

One of the Popsons' expert witnesses, with a PhD in psychology, testified that he had evaluated J.P. and obtained results similar to West Clark's previous evaluations, except that he found that J.P. had a superior nonverbal IQ score. AR at 2539 (HO finding # 29). He further testified that he did not believe that group instruction is appropriate for autistic children, citing a New York State study indicating that ABA/DTT is the treatment of choice. *Id.*

The instructional approach used by J.P.'s teachers has been described as "eclectic." AR at 2542 (HO finding ## 37–8). Instructional staff and specialists use a variety of techniques that are deemed developmentally appropriate for the child. *Id.* Many of these techniques have been advocated by TEACCH, a nationally known program for children with autism. *Id.* TEACCH methods include some direct one-on-one instruction, including the use of ABA techniques. *Id.*

Dr. John Umbreit ("Umbreit"), an expert in Applied Behavioral Analysis, special education, and educational programming testified for West Clark. Umbreit Tr. at 869, 875; AR at 922–44. Umbreit observed J.P. for one hour in both his at-home ABA/DTT program and in his preschool program. AR at 913–4, 926.

According to Umbreit, the "methodological flaws" in the 1987 study "are so significant that I don't think the data can be relied on for much of anything." AR at 908. In particular, Umbreit expressed his concern that children trained solely by the discrete trial format tend not to generalize very well and tend not to retain their skills well. AR at 918. He also noted that children with autism are capable of learning from their peers. AR at 931–2. "[T]he opportunity to interact with other kids both with special needs and normally developing children is very important." *Id.*

As for J.P.'s specific educational program, Umbreit testified that the IEP proposed by the case conference committee identified goals that "are appropriate and will benefit [J.P.]." AR at 930–1. He testified that the teaching staff is positive, and the school program is appropriate for meeting those goals. AR at 934. He further testified that he had reviewed the written narratives of J.P.'s progress provided by J.P.'s teachers and concluded that they contained a significant amount of data from which J.P.'s progress could be assessed. AR at 922–5. "I think what they have done in school represents an appropriate IEP and that [J.P.] has derived benefit from" the school's efforts. AR at 973.

Umbreit also expressed his belief that the at-home program conducted by BI-FAC was well structured and competently

administered. AR at 935. But he questioned whether the teaching of individual sounds independently and out of context might result simply in "sound barking," rather than true language development. AR at 937.

West Clark also presented testimony from Thorsen, the district supervisor of the Communication Disorders Program, the Autism Program, and Preschool Programs for the Covered Bridge Special Education District in Terre Haute, Indiana. AR at 945–57. Thorsen works with parents and helps to develop programs for children with autism. Thorsen Tr. at 1046–7. The Covered Bridge team is currently programming for 130 autism students. *Id.* at 1047–8. Thorsen has a background in DTT and TEACCH services for autism. *Id.* at 1042–5.

Thorsen observed J.P. in his preschool program for approximately one hour. *Id.* at 1052–3, 1059–63. Thorsen thought that the activities J.P. was engaged in would encourage communication and speech. *Id.* at 1063–4. She expressed her belief that these activities were just as conducive for learning to verbalize as discrete trial training. *Id.* at 1064–7.

Thorsen explained that:

[F]or the kinds of skills that [J.P.] currently exhibits, the goal is not just for speech, which is basically a motor sound production. The goal is to get him to understand and appreciate that there is a function and intent to communicate. ... When you merely drill sounds with him, ... there's no true basis or function for that. So we usually start with students who have autism [by] trying to help them understand that communication has meaning, communication has purpose, and communication has power. And through that, we then typically see a growth of language and speech if it is to come.

*Id.* at 1065. Thorsen acknowledged that BIFAC's goal is also to teach J.P. that "speech is a method of getting what I want." AR at 1065. But Thorsen explained her belief that "[i]ndividuals learn language by placing words, ideas, and cognitive skills together within certain kinds of contexts. That supplies meaning for them. And the preschool classroom is a very natural place to do that." *Id.* at 1067.

Thorsen testified that West Clark's proposed IEP for J.P. was well-rounded. *Id.* at 1062. She believed that the program of one-on-one teaching with immediate carry-over into the classroom was effective for J.P. because it helped him in learning to generalize. *Id.* at 1075–6. She also expressed her opinion that J.P. is ready for peer interaction. *Id.* at 1074–5. Thorsen believes that J.P. has made good progress in his preschool program and should remain there. *Id.* at 1102–3. Thorsen also noted that she has dealt with some ABA/DTT programs in her own school corporation, and she has not found that children who have been in a full time ABA/DTT program adapt well to being mainstreamed into a general education program. AR at 2544–5 (HO Finding # 47).

On the other hand, the Popsons believe that a full time ABA/DTT program is best for J.P. As a result, they did not agree with the committee's substantive decisions during the February 2001 case conference. AR at 2535 (HO Finding # 18). The Popsons also felt that the committee did not adequately consider their input. *Id.* Therefore, on March 16, 2001, the Popsons filed a request for a due process hearing. AR at 2525. The hearing was held on May 14–16. AR at 2527.

The Popsons' Post–Hearing Brief alleged that the process of formulating J.P.'s IEP was flawed because West Clark did not permit the Popsons to participate meaningfully in creating the IEP, and

West Clark then "lawyered" the account of the case conference to make it appear that they did. AR at 2647 63. The Popsons' Post Hearing Brief further alleged that the annual goals and short-term objectives proposed by West Clark were not appropriate for J.P. because the resulting IEP contained too few goals and because some of the goals it did contain were amorphous, not objectively measurable, or else unteachable, while other goals were too easy for J.P. *Id.* The Popsons also complained that certain important goals were not listed, such as toilet training and specific objectives for verbalization and vocalization, and that the language skills generally focused too much on the Picture Exchange Communication System, which the Popsons thought would not be useful for J.P. *Id.* In addition, although everyone agreed that eight hours of one-on-one instruction were necessary, this was not specifically listed in the IEP. *Id.* Finally, the Popsons' Post Hearing Brief criticized the services offered by West Clark as being inadequate to achieve the goals and objectives of the IEP. The Popsons felt that the reason for this inadequacy was that West Clark officials improperly allowed financial and staffing considerations to influence their judgment about J.P.'s educational needs. *Id.*

The Hearing Officer identified the following issues to be addressed:

1. Are the goals and objectives of the proposed [2001–2002] IEP appropriate?

2. Were the services provided appropriate to accomplish the goals and objectives in the current [2000–2001] IEP?

3. Were the provisions of the current IEP followed regarding charting and logging of behavioral and academic progress?

4. Are the ESY services for the summer of 2001, as contained in the proposed IEP, appropriate to meet [J.P.'s] needs?

5. Is [J.P.] entitled to compensatory instructional time for the Summer of 2000?

6. Is the program proposed for the 2001–2002 academic year appropriate [to progress toward the goals of the proposed IEP]?

7. If West Clark's program is not appropriate, is the program proposed by the [Popsons] appropriate?

AR at 2546–2550.

The Court summarizes the Hearing Officer's answers to these questions as follows:

1. Despite disagreement between the parties on specific points, the goals and objectives in the 2001–2002 IEP, as a whole, are appropriate for J.P. and consistent with 511 IAC 7–26–6(a)(2) and 34 CFR § 300.347(2)(j). The objectives are written in behavioral terms that are "measurable." There is no goal for toilet training, which remains an area of concern.

2. The 2000–2001 IEP was implemented appropriately, consistent with 511 IAC 7–27–7 and 34 CFR 300.350. The teacher and specialists who worked with J.P. were trained in working with children with autism and used an appropriate variety of techniques, including some direct instruction in a manner similar to the ABA/DTT approach preferred by the Popsons.

3. Although the law contains no specific requirement about how records of progress towards goals and objectives are to be kept, "the parents were reasonable to expect that logs and charts of progress would be available." Furthermore, the law requires that parents be regularly informed of their child's progress, 511 IAC 7–27–6(7)(B). Therefore, the IEP should be amended to specify how and when the parents will be informed.

4. The amount of classroom instruction (12 hours per week for six weeks) in J.P.'s ESY for the summer of 2001 is appropriate for J.P. The amount of occupational therapy is also appropriate. "Whether the number of hours of speech therapy [is] appropriate is unclear, however, and requires more information."

5. Because the goal of ESY services is to prevent regression and not to increase skills, and because the unrefuted evidence presented by J.P's speech therapist and his classroom teacher shows that J.P.'s skills did not regress significantly during the summer of 2000, compensatory instruction for inadequate service is not warranted.

6. Although there may be other educational approaches, such as ABA/DTT, that might benefit J.P. more, the school's responsibility is only to develop an educational program that addresses J.P.'s needs in all aspects of his disability and is reasonably calculated to provide him with educational benefit. "There is ample evidence that [J.P.] has shown progress [in the past] in many areas," from which it is reasonable to infer that his past IEP's did provide him with meaningful educational benefits. "Because the proposed IEP for 2001–2002 addresses similar needs, it is considered appropriate." In addition, "[t]here is no evidence that [West Clark] has violated IDEA or Article 7 procedural requirements" in developing J.P.'s IEP.

7. Having ruled that the IEP proposed for J.P. is appropriate, the Hearing Officer did not have reason to consider the merits of the Popsons' proposed alternative IEP.

AR at 2546–2550.

As a result of these findings, the Hearing Officer ordered that West Clark convene a new case conference meeting to amend the current IEP in light of the particular problems raised, including toilet training and the need for a better method for teachers and specialists to record data concerning J.P.'s progress. AR at 2550–2. In addition, West Clark was instructed to obtain the opinion of an independent speech therapist to determine the appropriateness of the speech therapy component of the ESY plan proposed for the summer of 2001. *Id.*

Subsequently, the Hearing Officer amended his Order, finding that "there is no need for the speech therap[ist's] opinion ... because the parents have refused services." AR at 2508. The Popsons appealed the Hearing Officer's decisions to the Board of Special Education Appeal ("BSEA"). AR at 2709. The BSEA upheld the Hearing Officer's conclusions of fact and law in their entirety. AR at 2715–6.

In appealing to this Court, the Popsons have highlighted certain additional evidence that they believe the Hearing Officer did not consider. The Popsons state that J.P.'s teacher, Cochran, "admitted that she destroyed records pertaining to J.P. that were less than five years old." P. Facts, ¶ 45. In the portion of the record that the Popsons cite as evidence, Cochran testified that she filled out formal progress updates for J.P.'s parents four times per year, which were not destroyed. AR at 524–6. In addition, she testified that she kept a school-home notebook "to give [the Popsons] daily progress reports on their child and what was happening in the classroom," which was also not destroyed. *Id.* Cochran explained that she was not required to keep the notebook. *Id.* She simply "wanted to be the child's voice," because J.P. "can't come home and say, Mom, we did this today." *Id.* The notebook also allowed the Popsons to write to her about their concerns and about J.P.'s activities at home. *Id.*

But in addition to all that, Cochran testified that she kept her own teaching notes about what she was working on with J.P. each day. *Id.* Or, if she was not working with J.P. directly, she would type up specific directions for her aides and they would check off what they had done. *Id.* Cochran testified that it was this last set of notes which she threw away at the end of the school year. *Id.* When asked if that was her normal practice with all her special education kids, she said "yes," her habit is to "clean out [her] files" at the end of each school year. *Id.* According to the Popsons, this constitutes an admission that Cochran, and by implication West Clark, engaged in a " 'policy or practice' of denying parents a right to review and inspect the educational records of their children." P. Facts, ¶ 46.

The Popsons also call this Court's attention to their belief that J.P. has continued to make meaningful educational progress under the ABA/DTT program. C. Popson testified that, by the date of the hearing, J.P. was making nearly every sound of the alphabet, and even beginning to put words together. AR at 70. She also noted that J.P. was making progress on consonant blends, reporting that he went up to the refrigerator one day and said "durrink." *Id.* J.P.'s speech therapist, Wahl, admitted that J.P. could pronounce about one-third of the letters of the alphabet pretty well. AR at 724. Wahl further testified that J.P. can say the words "open," "more," "hi," and "bye." AR at 720. But, she said "he is not really functionally communicating" with them and is probably unaware of their "communicative intent." *Id.* When asked directly whether J.P. was communicating better than he had been in December, Wahl answered: "Communicating? He is vocalizing a lot more. Communication? No." Wahl Tr. at 722.

The Popsons further attest that J.P. is playing better with his siblings and performing some simple tasks, such as feeding himself, that he had not been able to do prior to the ABA/DTT program. AR at 100. J.P.'s public behavior has also improved significantly. AR at 121.

## III. DISCUSSION

### A. JURISDICTION AND STANDARD OF REVIEW

"Any party aggrieved by the findings and decision" of a hearing officer "shall have the right to bring a civil action with respect to the complaint . . . in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In reviewing a hearing officer's decision, the district court "shall receive the records of the administrative proceedings [and] shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(B). The district court then must "bas[e] its decision on the preponderance of the evidence, [and] grant such relief as the court determines is appropriate." *Id.*

When neither party has requested that the district court hear "additional evidence," there is no new factual material to be presented. In that event, the motion for summary judgment becomes a procedural device, by which the parties ask the judge "to decide the case on the basis of the administrative record." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir.1994). This is not to be confused with the typical pre-trial summary judgment procedure in which the court must consider the facts in the light most favorable to the non-moving party. *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir.1997). Rather, under the IDEA, "[t]he party challenging the outcome of the . . . administrative decision bears the burden of proof." *Id.; Board of Educ. of Murphysboro*, 41 F.3d at 1167.

In *Rowley*, the Supreme Court held that, despite the "preponderance of the evidence" standard, the additional statutory requirement that the district court "receive the records of the administrative proceedings" implies that "due weight" must be given to the results of those proceedings. 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The rationale is that "[h]earing officers have ... greater expertise in educational policies and judges should not second guess them." *Beth B. v. Van Clay*, 211 F.Supp.2d 1020, 1025 (N.D.Ill.2001), *aff'd* 282 F.3d 493 (7th Cir. 2002).

Thus, the judicial standard for reviewing a hearing officer's findings under the IDEA lies somewhere between abuse of discretion and *de novo* review. The Seventh Circuit has explained that "due weight" requires courts to defer to the decisions of hearing officers, because of their special expertise in education law, but "not to the testimony of witnesses [at the hearings] or to the evidence—both of which the court must [evaluate] independently." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir.1997).

## B. EDUCATIONAL METHODOLOGY

This case forms part of a growing body of cases in which the central dispute is about the appropriate methodology for educating autistic children. *See, e.g., T.H. v. Board of Education of Palatine*, 55 F.Supp.2d 830 (N.D.Ill.1999); *Zachary Deal v. Hamilton County Department of Education* (unreported administrative opinion currently on appeal in a federal district court); *L.B. v. Nebo School Dist.*, 214 F.Supp.2d 1172 (D.Utah. July 2002); *Renner v. Board of Educ.*, 185 F.3d 635, 645 (6th Cir.1999); *Adams v. State of Oregon*, 195 F.3d 1141, 1150 (9th Cir.1999); *D.B. v. Ocean Township Bd. of Educ.*, 985 F.Supp. 457, 536 n. 59 (D.N.J.1997); *Alexander K.V. Virginia Board of Educ.*, 30 IDELR 967 (E.D.Va.1999); *Gill v. Colum-*

*bia*, 31 IDELR 29 (W.D.Mo.1999), *aff'd*, 217 F.3d 1027, 2000 WL 914155 (8th Cir.); *Fairfax County Pub. Schs.*, 22 IDELR 80 (Va.1995). West Clark has proposed what it characterizes as an "eclectic approach" for J.P. The Popsons propose instead an intensive, one-on-one, ABA/DTT program.

To be sure, the Popsons have raised a number of other, more specific objections to the IEP proposed by West Clark. And, they have also complained that their views (favoring the ABA/DTT approach) were not taken seriously at the case conference meeting in February, 2001. But the underlying vision behind these criticisms is that nothing short of a total commitment on the part of West Clark to the ABA/DTT approach would be appropriate for J.P.

In making their argument, the Popsons understandably have glossed over the distinction between what is "appropriate" for J.P. and what is "best." The IDEA empowers parents to be strong advocates for their children. It is the Popsons' right and duty to attempt to push and cajole West Clark into providing the best possible education for J.P. To that end, the Popsons have argued strongly that J.P. began progressing much more rapidly once he started his ABA/DTT training. But, while such an argument is highly relevant at a case conference meeting, it does not carry much weight in this legal action. The law does not require West Clark to provide J.P. with the better or best possible education. West Clark's duty is only to provide an education that is reasonably calculated to benefit J.P.

Therefore, to persuade this Court to intervene and impose its own judgment on the matter, the Popsons will have to do more than merely show that the IEP they have proposed would be better for J.P.; they must show that the IEP proposed by West Clark was "inadequate," in the strict legal sense prescribed by the IDEA. The

Popsons' burden is made more difficult by the fact that the Court is also required by law to give "due weight" to the Hearing Officer's findings,[6] especially where those findings entail an evaluation of educational merits.

■■■ According to the Hearing Officer, West Clark has been providing J.P. with a free appropriate public education, and the IEP that West Clark proposes for J.P. is reasonably calculated to continue to provide him with meaningful educational benefits. It follows that the Popsons' first and foremost legal hurdle is to demonstrate by more than a mere "preponderance of the evidence" that those findings by the Hearing Officer were wrong. Otherwise, this Court has no reason even to consider the merits of the Popsons' alternative ABA/DTT plan.

To put it another way, if West Clark can succeed in characterizing the dispute in this case as merely one between competing methodologies, both of which are educationally sound for autistic children, then the Court would have to find for West Clark. The Supreme Court has explicitly admonished judges not to substitute their own judgment about educational practices for the judgment of educational professionals or local authorities. *Rowley,* 458 U.S. at 208–10, 102 S.Ct. 3034.

But the Popsons frame the issue quite differently. "[T]his case does not present a 'competing methodology' dispute because the school employed what it called repeatedly an 'eclectic' intervention approach, and such an approach does not

qualify as a 'methodology.' Courts have so held." Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment ("P.Brief") at 1–2. The Popsons rely primarily upon *T.H. v. Board of Education of Palatine,* in which a federal district court held that the Palatine school district's "eclectic" approach to educating an autistic child was inadequate, and ordered the school district to pay for the child's home-based ABA/DTT program. 55 F.Supp.2d 830 (N.D.Ill.1999).

Of course, neither the *Palatine* Court, nor any other court of which this Court is aware, has held in general terms that taking an eclectic approach, *i.e.* attempting to utilize the best ideas from more than one educational theory, is in and of itself an unsound policy. The question of whether an approach used in any particular case "qualifies" as a sound educational practice is fact-specific. Moreover, the determination requires educational expertise.

Therefore, in order for the Popsons to prove that the particular approach used by West Clark to educate J.P. is not appropriate, it is not enough for them to invoke the word "eclectic," as if that were synonymous with "unsound." They still have to show that the particular approach used with J.P. was not reasonably calculated to provide him with meaningful educational benefits.

The problem is: How does one even attempt to prove to a court that a particular educational approach is unsound, given that courts are bound by law to defer to the educational expertise of school dis-

---

6. Not surprisingly, the Popsons argue that the Court does not have to give the Hearing Officer's findings due weight in this case because his findings, in the Popsons' opinion, were not 100% correct. But that argument would negate "due weight" as a standard in every case, because the challenging party will always claim that the Hearing Officer was incorrect. Moreover, even if the Court were to find that some technical point within the Hearing Officer's lengthy opinion was incorrect, that would not negate the Court's duty to give the rest of the Hearing Officer's findings due weight, unless the nature of the error gives rise to an inference that the Hearing Officer was biased or failed to consider the issues with the required thoroughness.

tricts, hearing officers, and other educational professionals? In this Court's view, the answer is as follows.

 An educational approach proposed by a school district for teaching a disabled child meets the legal standard for soundness if: (a) the school district can articulate its rationale or explain the specific benefits of using that approach in light of the particular disabilities of the child; (b) the teachers and special educators involved in implementing that approach have the necessary experience and expertise to do so successfully; and (c) there are qualified experts in the educational community who consider the school district's approach to be at least adequate under the circumstances. Furthermore, the Court believes that, in light of the "due weight" standard, a finding by a Hearing Officer that the educational approach proposed by a school district is sound constitutes persuasive evidence that each of these three criteria has been satisfactorily met.

The *Palatine* case is instructive because of its apparent similarity to this case.[7] The parents of T.H., an autistic pre-school child, disagreed with the school district on the most appropriate program to help T.H. achieve the goals identified in his IEP. *Palatine*, 55 F.Supp.2d at 836. The school district proposed enrolling T.H. in its "early childhood program," consisting of 2.5 hours per day in a "cross-categorical classroom" for four days per week during the school year. *Id.* This was to include 90 minutes per week of speech and language therapy, 60 minutes per week of social work, and 60 minutes per week of occupational therapy. *Id.* The parents proposed, instead, that the district consider the 35–40 hour per week ABA/DTT program already in place at T.H.'s home. *Id.* The

parents declined a compromise offer by the school district to add an additional ten hours per week of classroom time and requested a due process hearing. *Id.*

Unlike in the Popsons' case, the Hearing Officer found for the parents. *Id.* She held that the IEP proposed by the Palatine school district was " 'substantially inadequate' [because] it was not based on the recommendations of autism experts and did not provide sufficiently intense one-on-one training." *Id.* Although various school district "personnel express[ed] their discomfort with the intensive Lovaas [ABA/DTT] approach," the Hearing Officer found that they did not offer a viable alternative. *Id.* She "was unpersuaded by their 'vague, generalized ... *eclectic, child-led,* approach to educating autistic children.' " (Emphasis added.) *Id.*

Given that finding, the Hearing Officer further found that the school district's offer to increase the number of classroom hours by ten per week was not adequate, because there was no articulated plan for how to use the additional hours effectively. *Id.* at 836–7. As to the argument by the school district that T.H. had, in fact, made progress, the Hearing Officer found that any improvements observed by the district's early intervention team were not the result of their efforts, but actually the result of the already existing ABA/DTT program. *Id.* at 836. In addition, the Hearing Officer noted that the IEP was inadequate because of the complete absence of a summer ESY program. *Id.* Finally, the Hearing Officer found that the IEP had not been tailored to meet T.H.'s individual needs. *Id.* at 837. Merely putting T.H. in a regular early childhood program was not enough, especially given the Hearing Officer's finding that some of the school district personnel who helped for-

---

**7.** The parents even use two of the same experts, Dr. Luce and Dr. Mulick. *Palatine*, 55

F.Supp.2d at 839.

mulate the IEP "knew from direct observation that [T.H.] had trouble in group settings and that his participation in the playgroup required intens[ive] adult intervention." *Id.*

The Palatine Court expanded upon the Hearing Officer's findings, but did not alter them significantly. The Palatine Court found that, despite their discomfort with the ABA/DTT approach, school district staff could not "articulate a particular methodology which they prefer[red]." *Id.* at 838. The court noted that the occupational therapist for T.H. testified that she had never heard of the ABA/DTT approach before. Id. And, the court further noted that T.H.'s classroom teacher uses an educational method she calls "floor times," which she described as "following the child's lead;" however, she could "not explain how this generic approach could be effective for autistic children . . . who have problems 'attending.'" Id. Moreover, "[t]he district did not present a single early childhood teacher with significant training in the education of autistic children." Id.

The *Palatine* Court further noted that the IEP itself could "best be described as a work in progress." *Id.* at 840. While the case conference committee set "a number of appropriate goals" for T.H., the court found that school district personnel did not have a clear idea how to achieve those goals or measure progress toward those goals and believed that that was something to be worked out "after personnel in the early childhood program 'take a good look on a day-to-day basis.'" Id.

In addition, the *Palatine* Court observed that the early childhood program itself was not, in any way, designed to meet the needs of autistic children, and "the district did not present any testimony which would indicate [T.H.'s] ability to adapt to the . . . program." *Id.* at 838. This was true, the court noted, even though "[e]very one of

the autism experts who testified [at the hearings] felt that the cross-categorical classroom was . . . clearly inappropriate," especially "without an [individual] aide to keep [T.H.] on task." Id.

Thus, placed in the context of the legal standard formulated by this Court, the *Palatine Court* made the following findings of fact:

a. The school district could not articulate a rationale for its proposed "floor times" approach, or explain the specific benefits that this approach would confer on an autistic child like T.H.

b. The teachers and special educators responsible for implementing T.H.'s IEP did not have the necessary experience and expertise to do so successfully.

c. The school district did not present any expert testimony tending to show that the school district's approach to educating T.H. would be reasonably likely to accomplish its purpose, in light of T.H.'s particular disabilities.

Indeed, it does not appear that the Palatine school district offered any expert testimony at all in support of its approach. The expert witnesses cited by the court all seem to have been testifying for T.H.'s parents. These experts expressed opinions that the ABA/DTT program is superior for autistic children. They also strongly criticized the school's decision to place T.H. directly into an early childhood program without a teacher's aide or even transitional assistance.

Finally, the Palatine case is distinguishable from this case because the Hearing Officer found for the parents, not the school district. Therefore, by the time that case advanced to the district court, the burden lay with the school district to prove (by means of more than a preponderance of the evidence) that it did have an adequate IEP in place for T.H. The Palatine Court found that the school district could not meet that burden.

The facts in J.P.'s case are quite different. First, even if the approaches of the two school districts are both properly characterized as eclectic, that does not make them the same. Unlike the Palatine school district, West Clark incorporated a number of hours of one-on-one time into its curriculum for J.P. During that time, according to uncontested testimony, they did use ABA/DTT methods. The fact that school officials also believed that a certain amount of group time was appropriate for J.P., because learning occurs in context, does not mean that they relied solely, or even primarily, upon unstructured group time. Moreover, West Clark did not just throw J.P. into a normal pre-school group, as appears to have been the case with T.H. Rather, West Clark's IEP called for J.P. to have an instructional aide to give him one-on-one attention, at least during the period in 2000 when J.P. was first making the transition into the classroom.

The greater care which West Clark took in developing J.P.'s IEP's is indicative of the fact that West Clark's special education teachers had a greater understanding of J.P.'s needs. Unlike the Palatine school district, West Clark proposed to use a variety of techniques that were specifically designed for autistic children. As J.P.'s classroom teacher testified, these techniques included PECS and one-on-one ABA/DTT training, as well as group time designed to bring J.P. into the general preschool program. This is a far more articulated approach than the notion offered by T.H.'s teacher of "floor times" that are "child-led."

In addition, West Clark school personnel were able to articulate the principles involved. For example, J.P.'s speech therapist testified that, by using ABA/DTT methods, J.P. had made substantial progress in learning to vocalize. But she pointed out that he still was not communicating because he had not yet grasped the communicative intent of the sounds he was making. Her testimony made clear that she understood the difference between "vocalizing" and "communicating," and believed that the overarching goal of achieving functional communication would be best facilitated by means other than just discrete trial training. The Court cannot say whether this is a correct educational analysis, but it is certainly a rational one.

Second, J.P.'s teachers clearly were familiar with the special problems and needs of autistic children. Special education supervisor Reich testified that she had gone to many conferences and workshops on autism. Speech therapist Wahl testified that she was specifically trained in the ABA/DTT techniques which the Popsons advocate and that she uses them in almost everything she does. She also made it clear that she was willing to use other approaches to teach J.P. to communicate, as needed. In addition, all of J.P.'s teachers demonstrated a willingness to cooperate with BIFAC and to go to training workshops to learn more about ABA/DTT techniques.

 Third, West Clark presented two experts, Umbreit and Thorsen, who both testified, after observing J.P. in his preschool setting, that West Clark's program seemed to be an effective one for him. In addition, both Umbreit and Thorsen forcefully countered the Popsons' claims that the only reasonable way to teach an autistic child is by the ABA/DTT method.[8]

---

8. In principle, this testimony could be challenged in light of *Daubert* reliability standards for expert witnesses. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Even though district courts must respect the expertise of educational professionals, it is still their duty to play a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S.

Specifically, Umbreit testified that the Lovaas study upon which the Popsons' experts relied had "methodological flaws ... so significant that I don't think the data can be relied on for much of anything." In Umbreit's view, ABA/DTT tends to teach "sound barking" rather than functional communication, and children trained *solely* via the discrete trial format tend not to generalize very well and tend not to retain their skills. Thorsen expressed her belief that merely reproducing sounds, as a motor function, is not enough. The broader goal is "to help [autistic children] understand that communication has meaning, communication has purpose, and communication has power." According to Thorsen, the activities she observed in J.P.'s preschool classroom were just as conducive for teaching J.P. to communicate as discrete trial training.

The fact that the Hearing Officer made an explicit finding that West Clark was using many of the techniques advocated by TEACCH, which the Hearing Officer described as a nationally known program with a more eclectic view of how to teach autistic children, further persuades this Court that there is no consensus in the educational community about the proper way to teach autistic preschool children. Indeed, a bill was recently proposed in Congress to "establish ... a Task Force on Autism Spectrum Disorders," with one of its primary purposes being to "conduct a review of the effectiveness of existing educational models used with respect to the provision of special education for children with autism spectrum disorders." 2001 Cong. U.S. H.R. 4728.

Therefore, the Court finds that the Popsons have failed to meet their burden of showing that West Clark's approach to teaching J.P. is not based upon a *bona fide* educational methodology. To the contrary, West Clark has a rational approach that is supported by many members of the educational community. In addition, West Clark has teachers fully competent to administer its program. Given the Hearing Officer's finding that West Clark's IEP was specifically designed to provide educational benefits for J.P., the Court respectfully declines the Popsons' invitation to make a *per se* ruling that it could not have been, because it was not strictly an ABA/DTT approach.

## C. SUBSTANTIVE COMPLAINTS UNDER THE IDEA

It remains to consider the Popsons' more specific complaints about defects in J.P.'s past program and in West Clark's proposed IEP.

### 1. Extended School Year Services in the Summer of 2000

The Popsons allege that West Clark "knew or should have known that J.P. had an inappropriate IEP" in the summer of 2000, and that he "was not receiving sufficient educational benefits; yet [West Clark] failed to correct the situation." P. Brief at 11. This complaint is based upon the fact that the only service West Clark provided for J.P. that summer was eight hours of speech therapy.

The Popsons' experts testified (in retrospect) that eight hours for the entire summer was probably inadequate for a

137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238. However, neither party has raised this evidentiary issue, either at the hearings or before this Court. Furthermore, the record shows that Umbreit is an expert in Applied Behavioral Analysis, special education, and educational programming. And Thorsen has

practical expertise as the supervisor of a public school program responsible for teaching 130 autistic students. In addition, she has a background in DTT and TEACCH services. Therefore, it appears to have been appropriate for the Hearing Officer to find their testimony to be reliable and relevant.

preschool child with autism and speech apraxia.[9] For example, one stated: "That seems low. If the goal was to maintain a child's skill level . . . , I would be surprised if that was adequate." AR at 584.

The Popsons further claim that West Clark's own expert, Umbreit, has (retroactively) conceded the point. However, what Umbreit actually said was that eight hours *might* not be enough, if it were not structured so that the parents also received training in how to continue to provide therapy for J.P. between sessions. AR at 948–9. Therefore, to determine if the plan was adequate, it would be necessary to know how it was implemented, which was information Umbreit said he did not have. *Id.*

Nevertheless, the Popsons insist that there is enough evidence to conclude that the school "condoned a situation whereby J.P. could 'freefall.'" P. Brief at 12. The Popsons carefully avoided saying that J.P.'s skills actually did "freefall." That is presumably because the record indicates that his skills did not. At most, J.P. might have regressed *slightly* during the summer of 2000.[10] That hardly suggests that the ESY for summer of 2000 was "completely insufficient,"[11] as the Popsons claim. P. Brief at 12.

In fact, the record demonstrates that West Clark's ESY for the summer of 2000 at least came close to accomplishing its intended purpose, which was to prevent a regression in J.P.'s skills, so that he would be able to continue making progress in the

fall. *See* fn. 10. The testimony of J.P.'s teachers was uncontested, to the effect that J.P. showed himself ready and able to make rapid progress when he returned to school in the fall of 2000.

The Court is well aware that this result—J.P. did not regress significantly—does not prove that the ESY was adequate when designed. *See* fn. 9. However, it does tend to show that the ESY was not grossly inadequate. Moreover, it also tends to show that there was little or no net harm to J.P.; whence, the Court has no reason to intervene at this late date.

The Popsons' final argument is that the ESY in the summer of 2000 was inappropriate for J.P. because two other children with autism were also offered eight hours of speech therapy, even though neither of them had speech apraxia and both were already verbal. P. Brief at 25. In effect, the Popsons claim that children with greater disabilities must be offered more ESY services than children with lesser disabilities. *Id.*

▆▆ But the Popsons cite no legal authority for this proposition, and, as a matter of statutory interpretation, the Court finds that it is incorrect. The IDEA is not an anti-discrimination statute, requiring an analysis of comparative treatment of similarly situated individuals. The school district's duty is to provide each student with his or her own individualized plan. The relevant inquiry is whether that plan was

---

**9.** The standard is that the adequacy of an IEP, from a legal point of view, must be measured from the standpoint of those making the decision at the time it was proposed, not from the point of view of those evaluating the ultimate results of the plan. *Adams*, 195 F.3d at 1149.

**10.** Both parties agree that ESY services have a limited purpose, which is to prevent regression in the summer, not produce significant educational gains. *See Alamo Heights Independent School District v. State Board of Edu-*

*cation*, 790 F.2d 1153, 1158 (5th Cir.1986) (Purpose of ESY services are to prevent "severe or substantial regression," so that benefits of education over the school year would not be "significantly jeopardized.").

**11.** It is not clear what the Popsons are trying to say here, anyway. A thing either is or is not "insufficient." There is no question of degree, such as complete or incomplete insufficiency.

reasonably designed to confer meaningful benefits, not whether other disabled children had better or worse plans. By that standard, the Popsons have not shown that J.P.'s ESY for the summer of 2000 was inadequate.

### 2. Cookie Cutter Approach Designed to Reduce Costs

 The Court further rejects the Popsons' theory that special education director Reich used a cookie-cutter approach with J.P.,[12] and that this cookie-cutter approach was designed to reduce costs or solve staffing problems.[13] P. Brief at 13–14. The Popsons' evidence for this theory is all based upon innuendo and misstatements of the factual record. Furthermore, all of the concrete evidence cited seems to refer to events that occurred in the summer of 2000 or earlier, with the only services alleged to have been inadequate due to the so-called cookie-cutter approach being the ESY services for the summer of 2000. Therefore, the Popsons' attempted extrapolation of this theory to subsequent

IEP's is purely speculative.[14] P. Brief at 16–7.

 Moreover, to the extent that Reich may have mentioned financial concerns or other administrative constraints to one or more parents, P. Brief at 17, it was not indicative of an unlawful intent. The law does not forbid a school from taking financial concerns into consideration when formulating an IEP. *Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 892, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984); *Cedar Rapids Cmty. School Dist. v. Garret F.,* 526 U.S. 66, 119 S.Ct. 992, 999, 143 L.Ed.2d 154 (1999). What the law forbids is: (a) using cost as a reason for *denying* a free appropriate public education or (b) taking cost into consideration when implementing an IEP that has already been formulated. *See Clevenger v. Oak Ridge Sch. Bd.,* 744 F.2d 514, 517 (6th Cir.1984); *Washington State School for the Deaf,* 22 IDELR 987 (OCR 1995). Thus, if J.P.'s Case Conference Committee had already made a determination that J.P. needed (say) twelve hours of speech therapy in the

12. The primary basis for this argument is, again, the fact that two other autistic children received the exact same amount of speech therapy in the summer of 2000. The Popsons infer from this that West Clark must have made an arbitrary assumption that all three children had the same needs, rather than that each had individualized needs. But a more plausible explanation is that the eight hours was based upon a rational decision, however crude, that one hour per week of training for each child would be appropriate to review and retain that child's current individual skills.

13. The concrete evidence for this part of the theory seems to have been that: (1) one autistic child did not have a teacher's aide for a month because the previous aide moved away and it took the school a little time to fill the position; (2) another autistic child's parents were told that the school would not provide as many services as the pre-pre-school First Steps Program had provided; (3) the Popsons were told at one point by Reich that the IEP

which the Popsons objected to was all West Clark had to offer; and (4) the Popsons were told by J.P.'s teacher that if she had unlimited resources, there were more things she could do for J.P. *See* P. Brief at 21, together with the Facts section of this Opinion.

14. The only "fact" the Popsons alleged in support of this generalized version of the theory is that West Clark "admitted to [the Popsons] and other parents in the school system who were asking about education and services ... that they did not have the financial wherewithal or staffing to offer ABA-based teaching methods." P. Brief at 17. But the Popsons cite no testimony in the record from any parent alleging that West Clark officials ever said they would not offer ABA/DTT services because they were too expensive. Besides, as discussed below, when choosing between two competing methodologies, both of which are educationally sound, the school system is permitted by law to consider other factors, including cost.

summer of 2000 or, alternatively, if it were found by this Court that J.P.'s Case Conference Committee *should* have made the decision that twelve hours were necessary for J.P., then West Clark would have been violating the law by providing only eight hours.

But that is not the case here. J.P.'s IEP for the summer of 2000, which the Popsons themselves signed, only called for eight hours of speech therapy. West Clark provided that. The Popsons have failed to prove that West Clark knew or should have known at the time that eight hours would not be enough to prevent J.P. from suffering severe regression. Therefore, even if it were true that West Clark did take financial concerns into consideration when deciding upon eight hours, that would not have been a violation of the IDEA.

### 3. Extended School Year Services for the Summer of 2001

The Popsons argue that "no district employee ever explained on the record the criteria upon which [J.P.'s] proposed ESY 2001 services were based." P. Brief at 14. But West Clark is not obligated to provide a detailed explanation of the rationale behind every decision that it makes. If the Popsons thought the issue was so significant, they could have questioned West Clark officials about it either during the case conference meeting or during the hearing.

The Popsons do not cite any part of the record in which West Clark officials refused to answer specific questions about the rationale behind their proposed services for the summer of 2001.[15] Instead, the basis for the Popsons' argument that there was no rational basis for West Clark's proposal is that:

1. Given the fact that J.P.'s problems were essentially the same in 2001 as in 2000, it is irrational that West Clark offered J.P. so much more service in the summer of 2001. P. Brief at 15.

2. "[A]ny 'improvements' in the hours of education or services came ONLY after the Popsons begged for it." P. Brief at 15.

3. West Clark used a cookie-cutter approach in the summer of 2000, and again in the spring semester of 2001. P. Brief at 16.

The third of these arguments is irrelevant. Even if it were proven that West Clark took a cookie-cutter approach and failed to "individualize" its plan sufficiently for J.P. in the summer of 2000 (an argument this Court has already rejected) or in the spring of 2001 (an argument for which no evidence has been provided), that would not shed any light upon whether there was a rational basis for West Clark's proposed plan for the summer of 2001.

The second argument is lacking in legal merit. The law requires a school district to take the parents' wishes seriously when formulating an IEP. That is true, even if the parents ultimately reject the plan. Therefore, the fact that West Clark responded to the Popsons' urgings for more hours should redound to West Clark's credit, not its detriment. What would the Popsons wish instead? Should West Clark have refused to consider the Popsons' protestations?

Finally, the Popsons' first argument is not reasonable. Do the Popsons really mean to suggest that J.P. should have been limited to eight hours of speech therapy in the summer of 2001, just to be consistent? The Court does not see how a

---

**15.** The Court noted in the facts section that Reich did testify that she could not remember the basis for their decision to provide eight hours in the summer of 2000, but as far as the Court knows, she was not even asked about the summer of 2001.

policy of rewarding stubbornness and inflexibility on the part of the school district would benefit J.P.

The Popsons further argue that speech therapist Wahl's explanation for the proposed ESY was "illogical," because, according to the Popsons, she testified that "the difference between what J.P. received in the summer of 2000 and the marked increase in the number of hours he was offered for the summer of 2001 was due to the fact that the more J.P. knew, the more hours of schooling he would need to maintain his skills." P. Brief at 15. The Popsons claim that this " 'logic' . . . means that the children who are doing the most poorly in school will receive the least amount of ESY help, which certainly doesn't pass the straight-face test." *Id.*

But the Court does not find Wahl's reasoning to be illogical. The goal of mainstreaming an autistic child places more burdens on educators as the child gets older, not less. There are an increasing number of skills and behaviors necessary to adapt to a regular classroom. For an autistic child, it is reasonable to think that these skills must be reinforced in the summer. Far from seeming ludicrous, the notion that a three-year old might not require as many hours of summer school as a four-year old makes sense to this Court.

### 4. Trivial Benefits and Insubstantial Progress Toward Goals

■ The Popsons point out that only four out of thirty-five objectives for J.P. were deemed met by West Clark during his first year in the preschool program. P. Brief at 18. Of these, two were tasks which they say J.P. could already perform, and the other two were tasks which they consider to be relatively trivial. *Id.* The Popsons argue that this "tend[s] to sug-gest" that either the goals were inappropriate or the services provided were inadequate. *Id.* While conceding that a "school cannot . . . guarantee success in any particular goal," the Popsons contend that the fact that J.P. met so few of his objectives shows that his IEP's during the 2000–2001 year were not designed or else not implemented properly. *Id.* The Popsons were particularly disturbed that no objectives were met in communication or language, the skill areas that the Popsons consider most important for J.P.[16] *Id.*

■ However, the Court disagrees with the Popsons' analysis. In the first place, the appropriateness of an IEP must be determined at the time it is formulated. *Carlisle Area School v. Scott P.,* 62 F.3d 520, 534 (3d Cir.1995); *Adams v. State of Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999); *Roland M. v. Concord Sch. Committee,* 910 F.2d 983, 992 (1st Cir.1990), *cert. denied* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). The fact that the Popsons signed and approved each of the IEP's used during the 2000–2001 year is evidence that the Popsons considered the goals and objectives contained therein to be appropriate at the time.

In the second place, the Popsons confuse achieving a goal with making substantial progress towards a goal. The Popsons cite no authority for the proposition that when a preponderance of goals is not met, a court must conclude, using hindsight, that the goals were not appropriate. But this Court would agree that: where the failure even to *make progress* towards the various goals and objectives is pervasive, then the inference that those goals and objectives were not appropriate is reasonable. After all, an IEP can be amended at

---

16. As with many of the Popsons' arguments, the Court assumes that this is really a disguised dispute about methodology. The Popsons would have liked J.P. to have very con-crete ABA/DTT type objectives, which can be easily declared met But West Clark has set broader goals, that often remain unmet.

any time if the student is making insufficient progress.

But that is not the case here. J.P.'s teachers testified, and indicated in writing on J.P.'s evaluations, that he was making significant progress towards achieving a large number of his goals and objectives, not just the four that were deemed met. For example, in testifying that J.P. seemed to benefit from the revised 2000–2001 IEP, with all the one-on-one time implemented in the fall of 2000, Cochran specifically noted that J.P. was learning to shape his mouth, imitate, and start vocalizing. And Wahl testified that she saw significant gains in J.P.'s functional communication, calling his program "one of the best . . . in Southern Indiana."

The Popsons do not allege that all of the goals and objectives toward which J.P. was found to have been making substantial progress were trivial. Nor do they allege that his teachers' reports of progress were not credible. Moreover, the Hearing Officer's finding that J.P. was, in fact, making significant progress toward most of his goals and objectives must be given due weight.

Against that weight, the Popsons argue that "many of the unachieved goals and objectives [for 2000–2001] weren't included in the IEP proposal" for 2001–2002. P. Brief at 18–19. The Popsons accuse West Clark of "throwing out all its unachieved goals and objectives and creating a whole new list," thereby *"inadvertent[ly] admi[tting]* [the] inappropriateness of the [discarded] IEP." P. Brief at 18–19.

But this Court is unpersuaded. While not expert in educational matters, the Court believes that the goals and objectives for the proposed 2001–2002 IEP are more similar to than different from the goals and objectives in the various IEP's for 2000–2001. The Hearing Officer appears to have believed likewise, observing that the proposed IEP contained annual goals in the areas of fine motor skills, sensory processing, imitation, play skills, attending to tasks, and improving functional communication that were appropriate for J.P. The Hearing Officer further found that, under each goal, specific objectives were listed "that are behaviorally stated and are measurable." In fact, as far as this Court knows, the only goal that was dropped from the 2001–2002 IEP was a goal for toilet training. The Popsons do not mention any others in their brief. Thus, even if dropping toilet training constituted an error on West Clark's part, it could hardly be characterized as an intentional decision to drop all unachieved goals and replace them with more trivial ones.

Therefore, relying in part upon the Hearing Officer's findings, the Court finds that the evidence, on balance, does not support the Popsons' claim that J.P. only made insubstantial progress towards his goals in the 2000–2001 time period. The evidence also does not support a claim that the goals in J.P.'s proposed IEP were, for the most part, trivial and inappropriate.

## D. PROCEDURAL COMPLAINTS UNDER THE IDEA

### 1. Improper Consideration of Staffing and Budgetary Concerns

■ This is largely a rehash of arguments already discussed in the substantive complaints. The Popsons seem to believe that, under the IDEA, members of a case conference committee are flatly prohibited from taking cost into account. Therefore, the Popsons argue that West Clark's decisions regarding J.P.'s educational program were improper because of the alleged "overwhelming evidence" that those decisions were "based . . . on . . . budget and staffing issues." P. Brief at 21. The Popsons refer to unspecified "cries of poverty" by West Clark. *Id.*

But the Popsons' exaggeration of the record ill serves them. There is no testimony even remotely suggesting a cry of poverty. Nor, as far as the Court is aware, did school officials deny J.P. any services, which they conceded were necessary, merely because the school could not afford to pay for them. At best, the record intimates that the school may have had staffing problems in the summer of 2000 that took a little time to resolve. And, J.P.'s teacher may have indicated to the Popsons that she could do more for J.P. with more money.

■ However, as the Court has already explained, taking financial or staffing concerns into account when formulating an IEP or when providing services is not a violation of the IDEA.[17] A school district is not obligated by law to provide every possible benefit that money can buy. A school district need only provide an "appropriate" education at public expense. Therefore, it may deny requested services or programs that are too costly, so long as the requested services or programs are merely supplemental. *Clevenger v. Oak Ridge Sch. Bd.*, 744 F.2d 514, 517 (6th Cir.1984).

It follows that, in order to state a claim for a violation of the IDEA based upon improper consideration of costs, the Popsons first must identify some service that was either essential for J.P. to obtain meaningful benefits from his IEP or else deemed by his Case Conference Committee to be an integral part of his IEP, but

which was denied to him because of cost. *Irving Independent School Dist. v. Tatro*, 468 U.S. 883, 894, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984) (Only those services necessary to aid a handicapped child to benefit from special education must be provided.); *Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) (Nursing service was necessary for a quadriplegic student.); *Washington State School for the Deaf*, 22 IDELR 987 (OCR 1995) (Dormitory aide was necessary for safety of disabled student.); *Department of Public Instruction*, EHLR 352:653 (OCR 1988) (Occupation therapy services were integral part of disabled student's IEP.); *Alamo Heights Independent School Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1159 (5th Cir.1986) (Transportation to and from necessary services was necessary.).

It is clear to this Court that the Popsons do not have any such particular service in mind. Rather, the service that the Popsons think was improperly denied to J.P. was the entire ABA/DTT educational program offered by BIFAC.

The Court understands that the Popsons believe that their son *must* be enrolled in a full-time ABA/DTT program in order to make meaningful educational progress. But, as the Court has already explained, in order to prove that the ABA/DTT program they advocate is *necessary* for J.P., the Popsons would have to prove that the ABA/DTT methodology represents the only legitimate way to teach autistic chil-

**17.** The Popsons cite *Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) for the proposition that "it is wholly inappropriate (and impermissible) for a school district to make [special] educational decisions ... which are driven or motivated by financial considerations." P. Brief at 22. But the Supreme Court never made any such statement. The Supreme Court merely said that, if nursing care is *required* for a disabled student to

be able to attend school, a school district must provide that nursing care without regard to cost. *Garret F.* at 76–77, 119 S.Ct. 992. The key to understanding that holding is that there was no dispute about the fact that the nursing care was absolutely necessary for the student to have access to a free and appropriate education. The only question was whether nursing care constituted "medical services," which are excluded from coverage under the IDEA.

dren. This is something the Popsons have failed to do.

The evidence shows that West Clark's plan for J.P. is educationally sound. The fact that West Clark may have refused to pay for the additional ABA/DTT services, in part because of cost, does not taint West Clark's refusal or make it any less lawful. *L.B. v. Nebo School Dist.*, 214 F.Supp.2d 1172, 1189 (D.Utah.2002). Indeed, even if it could be proven that West Clark officials knew that J.P. could make better progress under the ABA/DTT program offered by BIFAC, it would not have been unlawful for West Clark to refuse to pay for BIFAC's services. *Id.* This was the central point of *Rowley.* In light of the fact that a deaf girl was already performing satisfactorily in an ordinary classroom, the Supreme Court held that the school district was not obligated to hire a sign language interpreter to enable her to achieve greater academic success. 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

## 2. Charting and Logging

 The Popsons argue that the Hearing Officer found that "[t]he school did not properly perform its duties as to charting and logging." P. Brief at 19. According to the Popsons, this constituted a "procedural error" of such magnitude that the Hearing Officer should have been required by law to hold that West Clark did not provide a free and appropriate public education to J.P. *Id.* But what the Hearing Officer actually wrote in his opinion was:

> There is no specific requirement in IDEA or Article 7 about how goals and objectives are to be kept, but the parents were reasonable to expect that logs and charts of progress would be available. Further, 511 IAC 7–27–6(7)(B) specifies how parents will be regularly informed of a student's progress, but

there is no evidence of such a provision in the IEP.

AR at 2706.

The Hearing Officer was correct that neither the IDEA nor Article 7 requires the school district to keep charts and logs in the ABA/DTT format desired by the Popsons. However, the Hearing Officer's language about the reasonableness of the Popsons' expectations is unclear, in that it does not contain any particular holding or instruction for West Clark.

If the Hearing Officer meant to suggest that it was reasonable to expect West Clark's teachers to provide charts and logs in an ABA/DTT format, then the Court disagrees. That would be tantamount to requiring the teachers to use discrete trial training, so they could "chart" J.P.'s progress in terms of the percentage of successful trials. Given the Hearing Officer's holding that it was not mandatory for the school to use an ABA/DTT model for teaching J.P., it seems unlikely that the Hearing Officer meant to hold that ABA/DTT recording methods must be used.

On the other hand, if the Hearing Officer merely meant that West Clark should be sensitive to the parents' "reasonable" desire for frequent and detailed information about J.P.'s progress and activities in school, the Court agrees. But the record shows that West Clark provided ample information in other formats, including school-home notebooks and formal progress reports rating percentage of improvement towards desired goals. West Clark's expert Umbreit testified that there was ample information in these reports, by which J.P.'s progress could be measured. The Popsons did not present any testimony, expert or otherwise, to the contrary. Therefore, the Court finds that the Popsons were kept abreast of J.P.'s progress.

Nevertheless, the Popsons complain that these forms of evaluation were not objec-

tive enough, presumably meaning in the clinical sense that they did not contain reports of successes and failures in performing discrete repeatable events. But the IDEA does not require such scientific objectivity; it merely requires honest and thorough reports of progress.

On a more technical note, the Hearing Officer indicated that West Clark failed to include in its proposed IEP a statement of the methods by which it would continue to keep the Popsons informed. This is an error, which needs to be corrected, as the Hearing Officer ordered. However, the Court finds that J.P.'s teachers made good faith efforts to keep the Popsons informed. Therefore, this technical defect cannot reasonably be characterized as a denial of a free and appropriate public education. It was merely an oversight that is easily corrected.

## E. ERRORS BY THE HEARING OFFICER

### 1. Misuse of Language Suggesting Critical Misunderstandings

■ The Popsons list several "errors" made by the Hearing Officer, which they seek to use as a basis for invalidating his opinion. For example, the Popsons state that the Hearing Officer "erred when he tipped his hand as to his inappropriate belief" that West Clark was in charge of developing the IEP, instead of the Case Conference Committee. P. Brief at 19–20. According to the Popsons, this shows that the Hearing Officer did not take seriously the legal requirement to include the parents as part of the IEP team. *Id.* As another example, the Popsons state that the Hearing Officer "erred . . . in stating that ABA and DTT . . . are the same thing." *Id.* According to the Popsons, "[t]his lack of understanding about the ba-

sic terminology at issue in this case [probably] contributed to the [mistaken] decisions of the hearing officer." *Id.*

However, the Court finds nothing untoward about the fact that the Hearing Officer's choice of language in a very lengthy opinion may have been imperfect on a few occasions. It is clear that the Hearing Officer knew, in general terms, the difference between ABA and DTT. He described that difference in some detail, and his description formed the basis for this Court's description. It is also clear that the Hearing Officer knew, and even discussed the fact, that the parents' input must be taken seriously when formulating an IEP.[18]

More importantly, the Popsons have not identified any one particular finding of fact or law made by the Hearing Officer in which his judgment might have been clouded by his supposed lack of understanding of these underlying points. Therefore, the Court finds that these complaints have no merit.

### 2. Unresolved Question About Speech Therapy Proposed for Summer 2001

■ The Popsons point out that the Hearing Officer stated that it was "unclear" to him "[w]hether the number of hours of speech therapy" proposed for ESY in the summer of 2001 was sufficient. P. Brief at 19. The Hearing Officer therefore ordered that more information should be provided, in the form of an evaluation by an independent speech therapist. The Hearing Officer subsequently vacated that order because the Popsons turned down West Clark's offer of ESY services.

Nevertheless, the Popsons argue that, because the Hearing Officer was unsure about whether West Clark's offer was sufficient, he should have ruled that West

---

**18.** The problem is that it is very difficult to describe a proposed IEP, which the parents

refused to sign, in any way other than as the school's proposed IEP.

Clark's entire proposed IEP for 2001–2002 was inadequate. The Court cannot follow the logic of this argument.

In the first place, the Court does not see why the Hearing Officer's request for more information should be adjudged equivalent to a finding that West Clark's proposed ESY services were inadequate. If the Hearing Officer had already determined that the services were inadequate, he would not have asked for more information.

■ In the second place, even though the Hearing Officer wanted more information about the particular question of speech therapy services for the summer of 2001, he still found that West Clark's proposed IEP for 2001–2002 was educationally sound. This shows that he believed that, even if he were to subsequently find that the number of speech therapy hours offered was not quite sufficient, he still would have found that West Clark's overall approach to educating J.P. was reasonably calculated to provide him with meaningful educational benefits. The Court notes that it is clearly within a hearing officer's prerogative to order minor adjustments in a student's proposed IEP, without invalidating the whole thing.

Thus, if the process had continued as it should have, the Hearing Officer would have either found that West Clark had offered enough hours of speech therapy in the summer of 2001, or else ordered West Clark to offer more hours. That being so, the only way that this Court would have found that West Clark failed to provide a free and appropriate public education for J.P. is if West Clark had failed to comply with the Hearing Officer's order.

The Popsons now propose that, because they (the Popsons) short-circuited the process by refusing ESY services, thereby preventing the Hearing Officer from making a ruling at all, this Court should find that West Clark is guilty of failing to provide a free and appropriate public education for J.P. The Court respectfully declines to do so.

Moreover, this Court has already found, in accordance with the Hearing Officer, that the ESY services offered to J.P. in the summer of 2000 were essentially adequate, because J.P. did not regress much, if at all, in his speech skills that summer. The record further shows that West Clark offered J.P. quite a bit more ESY time in the summer of 2001. Thus, the Court finds it unlikely that the Hearing Officer would have found that the speech therapy hours offered in the summer of 2001 were inadequate.

### F. FAMILY EDUCATION RIGHTS AND PRIVACY ACT ("FERPA")

■ The Popsons claim that J.P.'s classroom teacher, Cochran, violated their rights by destroying records pertaining to J.P. that were less than five years old. P. Brief at 26. This complaint refers to Cochran's personal notes to herself about J.P. which she threw out at the end of the school year. It does not refer to the school-home notebook or the more formal progress reports, which were not thrown out and which were made available to the Popsons.

The Popsons allege that Cochran's "record destruction" is a violation of 20 U.S.C. § 1232f and 34 C.F.R. §§ 75.730–4. P. Brief at 26–7. Section 1232f requires that any "recipient of Federal funds ... through any grant ... shall keep records which fully disclose the amount and disposition by the recipient of those funds ... and such other records as will facilitate an effective financial or programmatic audit." On its face, this requirement appears to be wholly inapplicable to Cochran's personal teaching notes, because those notes would be unlikely to facilitate an audit. The

Popsons have not cited any authority holding otherwise.

However, 20 U.S.C. § 1232g(a)(1)(A) may be more to the point. It states:

No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency ... the right to inspect and review the educational records of their children.

Although this prohibition comes closer to the mark, it still does not appear to be applicable to the notes in question. In the first place, this Court is not persuaded that Cochran's personal teaching notes constitute "educational records" in the sense intended by the statute. And, in the second place, the fact that one teacher has a *habit* of throwing out such notes at the end of each school year does not establish the existence of a *school-wide policy* or *practice* of throwing them out.

■■■ Moreover, even if Cochran's acts were a violation of FERPA, which appears not to be the case, FERPA cannot be used as a basis for creating a § 1983 cause of action. In *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Supreme Court analyzed a similarly worded proscription in FERPA, which provides that "no funds shall be made available" to "any educational agency or institution which has a policy or practice of permitting the release of education records." 20 U.S.C. §§ 1232g(b)(1)-(2). The Supreme Court found that even though an individual might have an interest in preventing the release of his education records, the statute "entirely lack[ed] the sort of [individual] 'rights-creating' language critical to showing ... congressional intent" to create a private cause of action under § 1983. —— U.S. at ——, 122 S.Ct. at 2277.

The Supreme Court distinguished FERPA's language from that used in anti-discrimination statutes such as Title IX ("[N]o person shall be subjected to discrimination."). *Id.* FERPA's provisions are directed only to the Secretary of Education, instructing the Secretary not to make funds available to an "educational agency or institution" which has a prohibited "policy or practice." *Id.* Therefore, they cannot serve as the basis for a § 1983 cause of action.

### G. ADA AND REHABILITATION CLAIMS

■■■ In its brief in support of its motion for summary judgment, West Clark argued at length, and with appropriate references to authority, that a claim for relief under either of these acts requires more than a mere restatement of allegations of a violation of the IDEA. D. Brief at 18–21. In particular, West Clark noted that the administrative record does not contain any evidence tending to show an intent to discriminate against J.P. *Id.* at 19–20.

■■■ The Popsons have not made any attempt to answer West Clark's arguments. Therefore, the Court finds that these claims have been waived. In addition, the Court's finding that West Clark did not violate the IDEA necessarily precludes a claim that, in violating the IDEA, West Clark intended to discriminate against J.P. because of his disability. *See, e.g.,* 34 C.F.R. § 104.33 (implementing an IEP that was developed in accordance with IDEA necessarily suffices to meet the standard for not discriminating under the Rehabilitation Act.).

### H. SECTION 1983 ACTION

The Popsons claim that the various violations of the IDEA, FERPA, the Rehabilitation Act, and the ADA constitute a viola-

tion of J.P.'s civil rights. Because the Court has already found that none of the predicate claims has merit, the § 1983 action must also be dismissed.

## I. COUNT II

The Popsons have conceded Count II of their Complaint. P. Brief at 28.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that the dispute between West Clark and the Popsons is one between competing methodologies, both of which appear to be educationally sound. The Court will not take sides in this dispute, leaving its resolution to the educational community in general, and to state and local agencies responsible for educating autistic children in particular.

The record shows that West Clark designed a program for J.P. that was reasonably calculated to provide him with meaningful educational benefits. While a better program may have been available, it is not West Clark's duty to provide the best possible education for J.P.

The Court further finds that West Clark followed the proper procedures in designing J.P.'s educational program. School officials worked closely with the parents, tried to learn the techniques the parents preferred, and incorporated some of the parents' ideas into their proposed IEP. The fact that school officials did not go far enough to satisfy the Popsons does not mean that the Popsons' wishes were not taken seriously.

West Clark has provided J.P. with an education that meets the standard for a free and appropriate public education. And, the IEP proposed by West Clark, to which the Popsons objected, was both procedurally and substantively sound.

Therefore, the Court **GRANTS** summary judgment to West Clark.